IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TAD VAN PELT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17 C 1128 |
| | ) | |
| BONA-DENT, INC., a New York | ) | Judge John Z. Lee |
| Corporation d/b/a BONADENT | ) | |
| DENTAL LABORATORIES; | ) | |
| BRUCE BONAFIGLIA, individually, | ) | |
| BRUCE HENRY PROPERTIES, LLC, | ) | |
| a New York limited liability company | ) | |
| d/b/a BONADENT DENTAL | ) | |
| LABORATORIES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Tad Van Pelt has sued Bona-Dent, Inc., Bruce Henry Properties, LLC, and Bruce Bonafiglia (collectively "BonaDent") for retaliatory discharge under Illinois common law and the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/15(b). Defendants have moved for summary judgment. For the reasons below, the motion is granted.

### I. Factual Background[1]

A. **BonaDent Expands into the Chicago Area and Hires Van Pelt**

BonaDent offers dental laboratory services to the dental industry. Defs.' LR 56.1(a)(3) Stmt. ("SOF") ¶ 4, ECF No. 73. Prior to 2015, Bona-Dent had locations in South Carolina, Florida, and New York. *Id.* ¶ 8.

---

[1] Unless otherwise noted, the following facts are either undisputed or deemed admitted by the party's noncompliance with LR 56.1. Facts that are unsupported by the proponent's citation to the record have been ignored for purposes of summary judgment.

In the summer of 2015, BonaDent considered plans to expand into the Illinois market. *Id.* To this end, Bruce Bonafiglia, BonaDent's President, began negotiating with Mike Aube, owner of Euro Tech Dental Laboratory ("Euro Tech") in Des Plaines, Illinois. *Id.* Bonafiglia and Aube eventually struck a deal, and BonaDent agreed to purchase Euro Tech's assets in December 2015, and Euro Tech agreed to wind up and liquidate its business. *Id.* ¶ 5; Defs.' Ex. H, Asset Purchase Agreement § 3.01.

As part of this arrangement, the parties agreed that Aube would be retained by BonaDent to manage the Des Plaines lab, and Euro Tech's employees would eventually be absorbed by BonaDent. SOF ¶ 7. In addition, as part of its growth plan, BonaDent hired Van Pelt as an at-will employee as its National Sales Director on November 30, 2015. *Id.* ¶¶ 3, 10; Pl.'s LR 56.1(b)(3)(C) Stmt. ("SOAF") ¶ 4.

**B.    BonaDent Discovers and Addresses Onboarding Issues**

To finalize the asset purchase process, Aube and Van Pelt distributed packets of onboarding documents to Euro Tech employees. SOF ¶ 11. Van Pelt also walked the employees through the process of filling out the paperwork, even though he had no prior experience in human resources. *Id.* ¶ 33; Pl.'s LR 56.1(b)(3)(B) Stmt. ("Pl.'s Resp. SOF") ¶ 11.

Van Pelt collected the documents and sent them to Jenna Crandall, BonaDent's Director of Human Resources, and Michelle Grillone, BonaDent's Human Resources Assistant. SOF ¶ 13. Van Pelt assured Crandall on January 5, 2016, that "everything is in the mail and should be in Seneca Falls tomorrow." *Id.*; Defs.' Ex. E, Van Pelt Dep. ("Van Pelt Dep.") at 64:24–65:6, ECF No. 73-1; Defs.' Ex. K, 1/5/16 Email from T. Van Pelt to J. Crandall ("1/5/16 Email"), ECF No. 73-1. Other than

certain irrelevant exceptions, Van Pelt did not indicate that there was any particular issue regarding the paperwork he had submitted to Crandall and Grillone. SOF ¶ 13; 1/5/16 Email.

After Grillone reviewed the paperwork on January 7, she reported to Crandall and Bonafiglia that six Euro Tech employees did not have proper eligibility documents. SOF ¶ 14. One of those employees was Aube's girlfriend. *See* Defs.' Ex. L, 1/8/16 3:07 PM Email from T. Van Pelt to B. Bonafiglia ("1/8/16 3:07 PM Tad Email"), ECF No. 74. BonaDent's counsel emailed Aube, and stated that BonaDent would not release certain funds to Aube related to the asset purchase until the employee issues were addressed. SOF ¶ 15.

Bonafiglia provided Van Pelt with a copy of counsel's email to Aube, and, although Van Pelt was not involved in any discussions with BonaDent's counsel, he was aware that the legal team was addressing the issue. *Id.* ¶ 40; Van Pelt Dep. at 74:21–75:4. Van Pelt relayed to Bonafiglia that Aube had told Van Pelt that he and his girlfriend were getting the necessary documentation later that afternoon. 1/8/16 3:07 PM Email. Van Pelt also told Bonafiglia that he had "played cheerleader and told [Aube] to get stuff taken care of and everything would get better." SOF ¶ 16. "I told him this was transition week and every week should get easier from here out once everything is on the up and up." *Id.*

Although Van Pelt's job description contained no human resources function, he continued to monitor the situation at the Des Plaines location when he was not traveling for work. *Id.* ¶ 37; *see id.* ¶ 38 (stating that Van Pelt travelled 50% of the

3

twelve weeks he worked for BonaDent). Van Pelt's role, however, did not involve making payments to any Euro Tech employees. *Id.* ¶ 41.

Of the six Euro Tech employees with documentation issues, within days, two provided proper documentation, and two were fired.[2] *Id.* ¶ 17. Aube indicated to BonaDent that the remaining two employees would work with an immigration attorney to provide the proper paperwork. *Id.* ¶ 19. BonaDent set a March 1 deadline for the two employees to submit the necessary documentation. *Id.* ¶ 21. One was fired on March 1 when she was unable to meet the deadline. *Id.* ¶ 22. The other, Aube's girlfriend, had received Polish divorce papers by the deadline in an effort to clear the way for her to marry Aube. *Id.* ¶ 23. But Crandall did not view the divorce papers or the potential marriage as rectifying a lack of proper documentation. *Id.* ¶ 24. Consequently, BonaDent fired Aube's girlfriend on March 17, 2016. *Id.*

Van Pelt had spoken with both Aube and Bonafiglia about Aube's intent to marry, and Van Pelt never refused to serve as a go-between for such conversations. *Id.* ¶ 30. In fact, Van Pelt did not refuse to perform any human resources role or task while employed with BonaDent. *Id.* ¶ 43. At no point during Van Pelt's tenure at BonaDent did he ever tell Bonafiglia that he was not going to do things the way that Bonafiglia wanted him to do them. *Id.* ¶ 45.

---

[2] Aube fired the two on January 12, 2016. SOAF ¶ 17; Pl.'s Ex. V, 1/12/16 Email from J. Crandall to B. Bonafiglia, ECF No. 85.

4

## C.     Van Pelt's Performance at BonaDent

At times, Bonafiglia could be a demanding boss, and Van Pelt understood that his job required him to show a sense of urgency and responsiveness to his requests. *Id.* ¶ 49. Yet, there were several occasions when Bonafiglia felt Van Pelt did not meet his expectations.

For example, Bonafiglia asked Van Pelt prior to Wednesday, January 6, 2016, to create a presentation for a meeting in Scottsdale, Arizona that following Tuesday, January 12. *Id.* ¶ 53. On Thursday, January 7, Bonafiglia made multiple requests to review Van Pelt's presentation, and Van Pelt responded by saying it was a "work in progress," and he would "polish it up over the weekend." *Id.* ¶ 54. Bonafiglia replied, "When will I have time to approve what my new guy is about to present to 18 of my team members?? No offense [T]ad but don't you think I should have a look?" *Id.* Van Pelt promised that he would put together something by Friday morning, to which Bonafiglia responded, "I'll expect something by 10am EST." *Id.* ¶ 54.

By way of another example, at the Scottsdale meeting, Bonafiglia requested that each BonaDent sales team member come up with a list of customers to join dental referral groups. *Id.* ¶ 56. Several weeks later, Bonafiglia asked BonaDent's National Sales Supervisor, Kathleen Sinicropi, to ask Van Pelt for his list. *Id.* ¶ 55. Van Pelt responded that he had nothing. *Id.* According to Van Pelt, it was unrealistic for Bonafiglia to believe that any of Euro Tech's customers could be referral group members because the "quality of [dental] offices is less consistent than in other regions of the country", and "Polish do business with Polish, Asians do business with

5

Asians, Russian with Russian, etc." Pl.'s Ex. K, 2/4/16 Email from T. Van Pelt to B. Bonafiglia ("2/4/16 Email"), ECF No. 79-1.

Yet another instance involved Van Pelt's failure to monitor the state of customer accounts. Bonafiglia informed Van Pelt on January 20, 2016, that a customer had stopped sending work to BonaDent for forty days without ever being contacted by a BonaDent sales representative. *Id.* ¶ 57. Bonafiglia had told Van Pelt to monitor top-50 customers' activity for thirty minutes a day, five days a week and to instruct his sales representatives to do so. Van Pelt admitted that the issue was "inexcusable" and that he would "do everything in [his] power as a leader to change this." *Id.* ¶¶ 58–59. Yet, on February 3, 2016, Bonafiglia discovered that Van Pelt and his sales representatives had failed to monitor customer activity on a daily basis. *Id.* ¶ 60. Bonafiglia instructed Van Pelt to speak to Sinicropi immediately to see "how little is being done with daily check on cases," calling it "dismal." *Id.* ¶ 61.

**D.  Van Pelt's Performance Review**

In early February, Crandall prepared a review of Van Pelt's performance with input from Bonafiglia, Sinicropi, and others. *Id.* ¶ 62. Although the reviewers remained confident that Van Pelt was going to be a good fit for his position, they expressed certain reservations. *Id.* ¶ 63. "The number one concern with Tad's performance so far has been a lack of follow through and sense of urgency. He must develop methods for prioritizing appropriately and making sure he follows through on tasks assigned by Bruce and others in the organization." *Id.*

6

### E. Van Pelt's Employment Is Terminated

A week after the performance review, Bonafiglia emailed Van Pelt on February 16 at 7:55 a.m. and asked how he was going to improve the performance of two sales representatives. *Id.* ¶ 64. Bonafiglia explained that the salesmen had such poor sales that they were actually costing BonaDent more money than they were bringing in. *Id.*

Because Bonafiglia did not receive a response, he emailed Van Pelt again at 11:12 a.m. and asked, "Did you not see this e-mail I sent at 8am???" *Id.* ¶ 65. More than an hour later, Van Pelt sent an email and explained that he had been on the road and that he would look more closely at the numbers that evening and figure out a plan. *Id.*

After a flurry of missed calls between the two, Bonafiglia finally connected with Van Pelt. *Id.* ¶ 66. Both Van Pelt and Bonafiglia concede that the conversation got heated. *Id.* ¶ 69.

For Bonafiglia's part, he felt exasperated by Van Pelt's lack of responsiveness. *Id.* ¶¶ 67–68; Def. Ex. G, Bonafiglia Dep. ("Bonafiglia Dep.") at 120:9–13, ECF No. 73-1. Bonafiglia asked Van Pelt why he had not been in the Des Plaines lab that day and why he had not responded to his emails. *Id.* ¶ 67. Van Pelt asked whether Bonafiglia expected him to drop whatever he was doing every time he called, to which Bonafiglia responded, "yes." *Id.* ¶ 68.[3]

---

[3] Because Van Pelt's denial of this statement is not supported with any citation to the record, it is deemed admitted. *See* LR 56.1(b)(3)(B).

7

Van Pelt complained to Bonafiglia about having to go to the Des Plaines lab because the "work environment was a bit tough." *Id.* ¶ 71. Although Van Pelt does not recall saying it, Bonafiglia states that Van Pelt called the lab a "dump" and "a piece of crap" and Aube a "moron." *Id.* ¶ 73; *see* Van Pelt Dep. at 95:7–10. Bonafiglia reacted, "It's my fucking lab you're talking about, Tad. You fucking know you're talking about my fucking lab." *Id.*; *see* Def. Ex. E, Van Pelt Dep. at 91:17–19, ECF No. 73-1. Based on Van Pelt's comments, Bonafiglia determined that he was not someone who could represent BonaDent to its customers. SOF ¶ 74.

According to Van Pelt, while he did not refuse to go to the lab, he told Bonafiglia that he did not feel comfortable there and that he was not hired to "arrange marriages and do things that I see is [sic] not legal." Van Pelt Dep. at 92:1–2; *see* SOF ¶¶ 70, 72. Bonafiglia does not recall Van Pelt saying this. SOF ¶ 73.

At the end of the conversation, Bonafiglia told Van Pelt that he was fired. *Id.* ¶ 75. Bonafiglia also stated that Crandall would contact him about the termination of employment. *Id.*

Crandall contacted Van Pelt the next day and provided information about his final paycheck and requested the return of BonaDent's property. *Id.* ¶ 76. She documented the termination of Van Pelt's employment based on what Bonafiglia had told her about the February 16, 2016, phone call. *Id.*

**F.    Van Pelt's Claims**

Based on these facts, Van Pelt has sued Defendants for retaliatory discharge under the Illinois Whistleblowers Act ("IWA"), 740 Ill. Comp. Stat. 174/15(b), and

8

under Illinois common law Defendants have moved for summary judgment as to both claims.

## II. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in h[is] favor." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal quotation marks omitted).

In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that might be drawn from the evidence." *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679, 682 (7th Cir. 2017). The Court must not make credibility determinations or weigh conflicting evidence. *McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019).

## III. Analysis

### A. Retaliation under the IWA

The IWA, in pertinent part, protects employees who "refus[e] to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. 174/20. To establish a violation of the IWA, "a plaintiff must show that (1) he refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation and (2) his employer

9

retaliated against him because of that refusal." *Sardiga v. N. Tr. Co.*, 948 N.E.2d 652, 656–57 (Ill. App. Ct. 2011). "It is the Plaintiff's burden to demonstrate a refusal and that the activity at issue would have violated a law, rule, or regulation." *Armour v. Homer Tree Servs., Inc.*, No. 15 C 10305, 2017 WL 4785800, at *12 (N.D. Ill. Oct. 24, 2017); *Sardiga*, 948 N.E.2d at 659.

As to the first element, Van Pelt has not established a genuine issue of fact regarding his refusal, even when viewing all disputed facts in his favor. "'Refusing to participate' means exactly what it says: a plaintiff who participates in an activity . . . cannot claim recourse under the Act." *Sardiga*, 948 N.E.2d at 657. Moreover, "'refusing' means refusing; it does not mean 'complaining' or 'questioning[.]'" *Id.*; *see Pignato v. Givaudan Flavors Corp.*, No. 11 C 7090, 2013 WL 995157, at *5 (N.D. Ill. Mar. 13, 2013) ("Because plaintiff did not actually abstain from any course of conduct or voice a refusal to do any task, he cannot claim the protection of 740 ILCS 174/20.").

Van Pelt states that, in compliance with BonaDent's requests, he constantly had to talk to, and exert pressure on, Aube regarding the status of his potential marriage to his girlfriend, who lacked employment-eligibility documentation. *See* SOF ¶¶ 30, 43, 45; Van Pelt Dep. at 69:11–16; 91:9–12. No rational jury could conclude from this conduct that Van Pelt refused to participate in the activity.

Nor has Van Pelt created a reasonable inference that the activity would result in the violation of law, rule, or regulation. It is a plaintiff's burden under the IWA to show "that a violation of the law 'would result' absent refusal, rather than simply a reasonable, good-faith belief in the existence of unlawful conduct." *Armour*, 2017 WL 4785800, at *12 n.25 (quoting 740 Ill. Comp. Stat. 174/20).

According to Van Pelt, he believed that Aube's plan to marry his girlfriend, which could affect her eligibility for employment, was illegal. Van Pelt Dep. at 91:23–92:2. At most, this amounts to a good-faith belief in the existence of unlawful conduct, which is insufficient for purposes of the IWA. *See Armour*, 2017 WL 4785800, at *12 n.25. So long as the couple intends to establish a life together, marriage qualifies as a proper basis to recognize a non-citizen as a legal permanent resident. *Valdivia v. Barr*, ___ F. Supp. 3d ___, No. 18-CV-3072, 2019 WL 5725439, at *1 (N.D. Ill. Nov. 5, 2019). And Van Pelt has not created a triable issue regarding whether Aube's potential marriage was a sham. Pl.'s Resp. SOF ¶ 25 (admitting that the two had been dating and living together for several years); *see id.* ¶ 32 (admitting that Aube married his girlfriend in July 2016, and they remain married). In short, Van Pelt has not created an inference that Aube's marriage would result in the violation of a law, regulation, or rule.

Moreover, because Van Pelt has not raised a reasonable inference that he refused to participate in illegal activity, he cannot show that BonaDent retaliated against him based on such a refusal.[4] Summary judgment is granted as to Count IV.

## B. Retaliatory Discharge under Illinois Common Law

To prove retaliatory discharge under Illinois common law, an employee must establish that he was "(1) discharged; (2) in retaliation for [his] activities; and (3) that the discharge violates a clear mandate of public policy." *Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d 909, 911 (Ill. 1988). "Illinois law allows claims for

---

[4] Because no rational jury could find in his favor as to the first element of his IWA claim, the Court need not address the second element.

11

retaliatory discharge when an employee is terminated for filing a workers' compensation claim or because the employee has reported the employer's criminal conduct, either to law enforcement personnel or to the company itself." *Bourbon v. Kmart Corp.*, 223 F.3d 469, 472 (7th Cir. 2000); *see Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 879–80 (Ill. 1981); *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 360–61 (Ill. 1978).

Because Van Pelt never filed a workers' compensation claim or contacted law enforcement, he must create a genuine issue of fact regarding whether he reported criminal conduct to BonaDent. He has failed to do so.

It is undisputed that Grillone, not Van Pelt, informed Crandall and Bonafiglia that six Euro Tech employees did not have proper identification documents with their I-9 forms. SOF ¶ 14; Van Pelt Dep. at 62:23–63:3 ("I'm not in HR, so I didn't know."). And it was Bonafiglia who forwarded emails to Van Pelt to apprise him of what was going on behind the scenes, not the other way around. Defs.' Ex. L, 1/8/16 1:55 PM Email from B. Bonafiglia to T. Van Pelt, ECF No. 74. Nor does the mere fact that Van Pelt was responsible for monitoring the situation establish that he reported any criminal conduct beyond the information that BonaDent already possessed. Pl.'s Resp. SOF ¶ 34; SOAF ¶ 8.

Based on these facts, Van Pelt has not satisfied his burden of creating a triable issue regarding whether he reported criminal conduct to BonaDent. Accordingly, he has also failed to establish that BonaDent retaliated against him based on any such reporting. Summary judgment is also granted as to Count III.

## IV. Conclusion

For the above reasons, Defendants' summary judgment motion is granted. Because no other claims remain, this case is hereby terminated.


**IT IS SO ORDERED.**                    ENTERED   3/18/20

_____
**John Z. Lee**
**United States District Judge**